UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


| | |
|---|---|
| JUSTIN WOODS, b/n/f DIANA WOODS and CHARLES WOODS and DIANA WOODS and CHARLES WOODS, Individually,<br><br>        Plaintiffs<br><br>     -vs-<br><br>CSX TRANSPORTATION, INC<br><br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) CAUSE NO. 2:07-CV-29<br>)<br>)<br>)<br>)<br>) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KRISTOPHER WOODS, b/n/f DIANA WOODS and CHARLES WOODS and DIANA WOODS and CHARLES WOODS Individually,<br><br>        Plaintiffs<br><br>     -vs-<br><br>CSX TRANSPORTATION, INC.<br><br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CAUSE NO. 2:07-CV-30<br>)<br>)<br>)<br>) |


## OPINION AND ORDER

This cause is before the court on the defendant CSX Transportation, Inc.'s

summary judgment motion. Justin and Kristopher Woods filed separate

complaints for damages; their parents, Charles and Diana Woods, were named

individually as plaintiffs in both complaints. The cases were consolidated in this

proceeding. This action arises out of an accident that occurred when 7 year-old

Justin Woods was struck by a CSX train after following his 9 year-old brother

Kristopher Woods, and their friend, Jonathan Woodward, onto train tracks owned by CSX. For the following reasons, the court grants the defendant's summary judgment motion.

I. FACTS

The following facts are taken from the summary judgment record and are viewed in the light most favorable to the plaintiffs. March 13, 2006, the day of the accident, was sunny and clear. Kenneth Blanton was the engineer and David Winters was the conductor of a westbound CSX freight train from Willard, Ohio. Mr. Winters had made this run at least a thousand times before the accident and Mr. Blanton had made the run numerous times.

The accident occurred in Hammond, Indiana, on the northernmost set of tracks of CSX's right of way just east of Calumet Avenue. The railroad tracks that pass through this location are a CSX main line that CSX uses to haul freight. CSX doesn't allow people on its right of way at that location without express authorization. The FRA classifies the tracks as Class 3, with a maximum allowable operating speed of forty m.p.h. There was a permanent "slow order" that would have reduced the speed limit to thirty m.p.h. at the Illinois state line.

Calumet Avenue runs north and south and intersects the two main tracks at this location at a right angle. There is a grade grossing to the east of Calumet Avenue at Ash Avenue. The tracks pass under I-90 and the South Shore railroad tracks at or near Columbia Avenue, to the east of Ash Avenue. To the north of the

location is a seven foot tall chain link fence topped by barbed wire. The fence lies roughly fifteen feet to the north of the tracks' northernmost rail, and encloses Arrow Uniform Company. Hudson Street (running east/west) lies to the south of the tracks, and runs parallel to the tracks. No sidewalk or buffer separates the roadway and the CSX tracks north of Hudson Street. Hudson Street stops at Cedar Avenue, which is just east of where the accident occurred.

Kristopher, Justin, and Jonathon were walking home from Washington Irving School. Justin and Kristopher lived on Huehn Street, several blocks to the north of the tracks where the accident occurred. Kindergartener Justin had turned seven less than a month before the accident, his brother Kristopher was nine years old and in third grade, and Jonathon was a year or so older than Kristopher. Justin and Kristopher's mother, Diana Woods, testified that this was the first time Kristopher and Justin had walked home from school by themselves. Before that day, either their neighbor, Kristy, would pick up the boys or Mrs. Woods would meet them near the school. When Mrs. Woods met the boys, they would walk to Calumet Avenue and cross the railroad tracks just inside Calumet Avenue.

Kristy was to pick up the children from school on the day of the accident. When she didn't arrive, the boys decided to walk home by themselves, taking a different path than they normally took with their mother. Kristopher testified that the three boys crossed the tracks just east of the Taco Bell on Calumet Avenue at a point where they had never crossed before. Kristopher said a fence surrounding

Arrow Uniform company was on the other side of the tracks. The boys intended to cross the tracks, and then walk down along the side of the fence toward their home. Kristopher testified that he saw the train that would strike Justin, but the train appeared to be stopped. The children ran over the tracks where there was no public crossing; Justin was following Kristopher. Kristopher and Jonathon made it safely across the tracks, but Justin's shoe got stuck, causing him to fall between the rails, where the train struck him.

Kristopher had seen trains travel on these tracks as he went to and from school before that day, and also had seen trains stopped east of Calumet Avenue. Charles Woods testified that he had seen a train stopped on the tracks at the location of the accident heading in a westerly direction seven or eight times over a five-year period. Mrs. Woods also testified that she observed trains stopped east of Calumet Avenue when she would bring her children home from school in the afternoon, but couldn't identify any of the trains as CSX trains.

Engineer Blanton first saw the boys as the engine cleared the overpass at or near Columbia Avenue when, according to the plaintiffs, the train was approximately 2,192.37 feet from the boys. The boys were walking south of the tracks on Hudson Street in a westerly direction towards Calumet Avenue. Mr. Blanton testified that he kept his eyes on them because he was afraid that little kids might dart out. He also testified that he was concerned because they were children. He didn't reduce the train's speed.

Evidence conflicts as to the boys' location just before the accident. Two

witnesses said they saw the boys running around in the Taco Bell parking lot; one witness said they were far away from the tracks. When asked if the boys "were ever in or around the Taco Bell parking lot near where the dumpster is located" before the accident, Kristopher stated "I don't think so." Kristopher also said the boys weren't playing around in the Taco Bell parking lot. Mr. Blanton testified that he saw the boys walking down the road, and at a certain point, saw them break away running towards the tracks by the Taco Bell. Because Hudson Street stops at Cedar Avenue, which is east of the Taco Bell, the boys had to travel off of Hudson Street to a point by the Taco Bell before heading onto the tracks. Justin ran across the south tracks and was hit by the train when trying to cross the northern set of tracks. The plaintiffs contend that Mr. Blanton wasn't paying attention to the boys because he testified that the boys were on the road and then he saw them break away for the tracks, failing to explain what happened in between when they were no longer on Hudson Street. Mr. Winters didn't observe the boys until they were running towards the tracks.

Engineer Blanton testified that he started engaging the train's whistle before Columbia Avenue, not because of the boys' presence, but because the train was at road crossings. Mr. Blanton couldn't remember whether the boys turned and looked toward the train at any point or where the boys were when the train crossed Ash Avenue. Mr. Blanton explained that when the boys ran towards the tracks, he sounded the whistle "more" and didn't let up. The train's event recorder showed that the horn was sounded no less than seven times for varying durations

in the forty-three seconds before Mr. Blanton engaged the emergency brake; the horn sounded for a total of just over twenty-eight seconds during this time. A witness who was at the Taco Bell at the time of the accident stated that he heard the horn and saw the train coming from the east. Kristopher testified that he didn't hear the horn before the accident. Justin testified that he doesn't remember hearing a horn or even seeing the train before the accident.

Mr. Blanton testified that he engaged the emergency braking system when the boys broke and ran toward the tracks. The train was traveling at thirty-eight m.p.h. before the accident, sped up to thirty-nine m.p.h. at 15:46:30, then went back down to thirty-eight m.p.h. at 15:47:10 — seconds before Engineer Blanton applied the emergency brake. The train came to rest to the west of Calumet Avenue, and (according to the plaintiffs) traveled a distance of 1,102 feet before stopping. The train crew sent an emergency broadcast over the radio and waited for help to arrive. After receiving a call about the accident, Mr. Woods came to the scene to find Justin in the ambulance.

Mrs. Woods testified that she had always told the children not to play on the tracks, to walk fast over the tracks, and to cross the tracks at the crossing at Calumet Avenue. Justin was always supervised when crossing the tracks before that day, and Mrs. Woods had "never thought they'd be walking home by themself (sic)[,]" because either a friend would pick the boys up from school, or Mrs. Woods would meet the boys before they crossed the railroad tracks. When asked if Justin understood and appreciated the dangers of crossing railroad tracks, Mrs. Woods

testified "[f]or the most part[ -]as much as a 7-year-old comprehends."

During his deposition, Justin testified that he couldn't remember if his parents or anyone at school ever talked to him about not going over railroad tracks or that walking on or near railroad tracks was dangerous. Justin never said that he knew trains or tracks were dangerous, or that he should listen for horns when around railroad tracks. Kristopher acknowledged that he knew it was dangerous to be near trains.

Justin filed suit claiming that CSX, through its agents, was negligent in the operation of its train and "the maintenance of its track and easement, . . . was not keeping a proper lookout, was traveling at an excessive and unsafe speed, did not properly sound the train's whistle and/or horn, and was maintaining an attractive nuisance for school children such as Justin." Mr. and Mrs. Woods also seek damages for medical expenses, lost services, and negligent infliction of emotional distress. Kristopher also brought a claim seeking damages for negligent infliction of emotional distress.

The defendants have moved for summary judgment, arguing that federal law preempts the plaintiffs' claim of excessive speed; that CSX only owed a duty to Justin and Kristopher to refrain from engaging in willful and wanton conduct after discovering their presence on CSX property; that there is no evidence that CSX engaged in willful and wanton or even negligent conduct towards the plaintiffs or that CSX's conduct caused the plaintiffs' injury; that the attractive nuisance doctrine doesn't apply; and that summary judgment should be granted on Mr. and

Mrs. Woods' claims and Kristopher's claims because these claims depend on the success of Justin's underlying negligence claim.

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004); Rand v. CF Indust., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors . . .").

The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha

County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999)); Anderson v. Liberty Lobby, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III. Discussion

### *Federal Preemption of the Plaintiffs' Excessive Speed Claim*

The plaintiffs assert that CSX was traveling at an excessive and unsafe speed. CSX says the Federal Road Safety Act (FRSA) preempts the plaintiffs' excessive speed claim.

The FRSA provides a comprehensive system of regulation of railroads. The Secretary of Transportation is empowered to issue regulations to supplement the FRSA. 49 U.S.C. § 20103. As part of that regulatory system, the Secretary has issued regulations setting forth the maximum allowable speed for trains. See 49 C.F.R. § 213.9. The FRSA contains an express preemption provision that displaces the states' authority to regulate railroad safety when the Secretary "prescribes a regulation or issues an order covering the subject matter of the State requirement." See 49 U.S.C. § 20106(a)(1)-(2). The state may adopt or continue in

force an additional or more stringent law, regulation or order if the law, regulation or order is "necessary to eliminate or reduce an essentially local safety or security hazard; . . . is not incompatible with a law, regulation, or order of the United States Government; and . . . does not unreasonably burden interstate commerce." See 49 U.S.C. § 20106(a)(2). Recently, Congress amended 49 U.S.C. § 20106, clarifying that "when a party alleges a railway failed to comply with a federal standard of care established by regulation or with its own plan, rule, or standard created pursuant to a federal regulation, preemption will not apply." See Henning v. Union Pacific R.R. Co., 530 F.2d 1206, 1215 (10th Cir. 2008) (citing 49 U.S.C. § 20106(b )(1)).

In CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 661, the widow of a truck driver killed in a crossing collision sued the railroad under Georgia law, alleging that the railroad operated its train at an excessive speed and failed to maintain adequate warning devises at the crossing. The Supreme Court held that the FRSA's preemption clause barred Mrs. Easterwood's excessive speed claim. Id. at 674-676. The Court reasoned that § 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings, explaining that the "limits were adopted only after the hazards posed by track conditions were taken into account." Id. at 674. The speed limits "must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that [plaintiff sought] to impose on [defendant]." Id.

While a saving clause allows a State to "continue in force an additional or more stringent law . . . relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard . . .," the Court found that this clause didn't apply to the common law claim of negligence, which "provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions." Id. at 675. The Court further explained that at the very least, this renders a plaintiff's reliance on the common law incompatible with FRSA and the Secretary's regulations. Id. The Court noted that "related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard," might not be preempted. Id. at 675, n. 15.

The FRSA classified these tracks as Class 3. The maximum allowable operating speed for a freight train on a Class 3 track is forty m.p.h. 49 C.F.R. § 213.9. Undisputed evidence establishes that CSX's train never exceed forty m.p.h. for more than a mile before the accident.

The plaintiffs first respond by asserting that there is a genuine issue of material fact about the maximum speed limit because Mr. Winters testified that the speed limit was twenty m.p.h. The plaintiffs are mistaken. Mr. Winters never stated that the speed limit was twenty m.p.h.; this statement appeared in his deposition transcript as the result of a court reporter's error. CSX attached a declaration from the court reporter and Mr. Winters as evidence of this error. The court reporter also attached a copy of her notes from the deposition showing that

Mr. Winters testified that the speed limit was forty m.p.h. Based on the evidence, Mr. Winter's testimony as to the speed limit raises no genuine issue of material fact. Even had Mr. Winters testified that the speed limit was twenty m.p.h. though, 49 C.F.R. § 213.9, not Mr. Winters, sets the maximum speed limit. No genuine issue of material fact exists concerning the maximum speed limit in the area.

The plaintiffs also contend the train was supposed to slow for a permanent speed order, but wasn't slowing down. The plaintiffs state that "[t]he preemption doctrine does not allow a train to ignore a slow order; it must be obeyed and it was not in this case." While a train cannot ignore a slow order, see e.g., Murrell v. Union Pacific R.R. Co., 544 F. Supp. 2d 1138, 1151 (D. Or. 2008), there is no evidence that the train couldn't have slowed to thirty m.p.h.; the speed restriction came into effect at the Illinois state line, some 4,125 feet from the accident. No evidence supports the plaintiffs' contention that the train wasn't obeying the speed order.

The plaintiffs' final argument on the preemption issue is that their primary claims relate to tort law duties to keep a proper lookout and to slow or stop a train to avoid a specific individual hazard, and that federal law doesn't preempt such claims. Many courts have held that Easterwood's excessive speed holding doesn't preempt a claim for failure to slow or stop to avoid a specific individual hazard. See Peters v. Union Pacific R.R. Co., 455 F. Supp. 2d 998, 1002 (W.D. Mo. 2006), and cases cited therein; see also Stevenson v. Union Pacific R.R. Co., 110 F. Supp.

2d 1086, 1089 (E.D. Ark. 2000), and cases cited therein. "Generally speaking . . . a specific, individual hazard is a person, vehicle, obstruction, object or event which is not a fixed condition or feature of a crossing and cannot be addressed by a uniform, national standard." Anderson v. Wisconsin Cent. Transp. Co., 327 F. Supp. 2d 969, 978 (E.D. Wis. 2004). A specific, individual hazard is a unique occurrence that could cause an accident to be imminent rather than a generally dangerous condition — a commonly cited example is a child standing on a track or a motorist stranded on the track. Anderson v. Wisconsin Cent., 327 F. Supp. 2d. at 978 (citing Bashir v. Nat'l R.R. Passenger Corp., 929 F. Supp. 404, 412 (S.D. Fla. 1996); see also Alcorn v. Union Pacific R.R. Co., 50 S.W.3d 226, 242 (Mo. 2001).

A number of courts have held that the FRSA preempted excessive speed claims despite a plaintiff's assertion that there was a specific hazard associated with the crossing where the accident occurred. In Herriman v. Conrail Inc., No. 1:94-CV-232, 883 F. Supp. 303 (N.D. Ind. 1995), the court held that artificial lights mounted on a nearby building didn't constitute a specific, individual hazard because the lights were continuously present at the crossing, and the duty the plaintiffs sought to impose wasn't one that would have required that particular engineer to slow down, but would require a substantial reduction in speed by every train entering that crossing at night. Id. at 307; see also Seyler v. Burlington Northern Santa Fe Corp., 102 F. Supp. 2d 1226, 1236 (D. Kan. 2000) (heavy rainfall, combined with a weather service flash flooding warning is not a specific

individual hazard), citing to the following cases finding that no specific individual hazard existed); Cox v. Norfolk and Western Ry. Co., 998 F. Supp. 679, 687 (S.D. W.Va.1998) (snow covered crossing); O'Bannon v. Union Pac. R.R. Co., 960 F. Supp. 1411 (W.D. Mo.1997) (inadequate warning devices, grade/angle of crossing, proximity to highway), *aff'd*, 169 F.3d 1088 (8th Cir.1999); Earwood v. Norfolk Southern Ry. Co., 845 F. Supp. 880, 888 (N.D. Ga.1993) (congested intersection, impaired visibility).

Courts have interpreted Easterwood's reference to a specific individual hazard to mean a transient condition posing a hazard that could lead to a particular accident. For example, in Missouri Pacific R.R Co. v. Lemon, 861 S.W.2d 501, 510 (Tx. Ct. App. 1993), the plaintiffs' claim wasn't preempted where they alleged that the train engineer negligently failed to reduce the train's speed when improperly parked tank cars obstructed his view of a crossing, because that hazard wasn't taken into account when the Secretary of Transportation established speed limits for trains. See also Bakhuyzen v. National Rail Passenger Corp., 20 F. Supp. 2d 1113, 1117-1118 (W.D. Mich.1996) (poor visibility due to snow constituted specific individual hazard).

Other courts have found that a motor vehicle's "unwavering approach" presents a specific individual hazard. In Alcorn v. Union Pacific R.R. Company, 50 S.W.3d at 242, the jury concluded that the train crew knew or should have known, by reason of the "unwavering approach" of the car that a collision was imminent. The train engineers saw the vehicle approaching the crossing and saw

that the car's speed was neither increasing nor decreasing. <u>Id.</u> Knowing from previous close encounters that the crossing was dangerous, the engineers had begun to sound short blasts on the emergency horn, but they didn't slacken speed. <u>Id</u>. The court found that the vehicle's unwavering approach toward the crossing, when the engineers knew or should have known that a collision was imminent, constituted a specific, individual hazard. <u>Id.</u>; <u>see also</u> <u>Anderson v. Wisconsin Transp. Co.</u>, 327 F. Supp. 2d at 978-979 (finding that the movements of the vehicle approaching the tracks weren't part of the general conditions at the crossing and couldn't have been addressed by a uniform, national standard); <u>but see</u> <u>Liboy v. Rogero</u>, 363 F. Supp. 2d 1332, 1340-41, n. 10 (M.D. Fla. 2005) (noting that approach of automobile to railroad crossing was an everyday occurrence, and thus was not a specific, individualized hazard).

At least one court has addressed the hazard of children crossing train tracks. In <u>Bashir v. National R.R. Passenger Corp.</u>, 929 F. Supp. 404 (S.D. Fla. 1996), two brothers, believing they could cross the tracks before an approaching train arrived, dashed in front of the train. <u>Id.</u> at 408. One of the boys was struck by the train and died. <u>Id.</u> The plaintiff's complaint alleged that the defendant was negligent "[b]y failing to stop the train prior to striking the persons crossing the tracks." <u>Id.</u> at 412. The court held that claim alone could stand, but the plaintiff's remaining claim for negligent failure to stop the train *to avoid striking the decedent*, was preempted. <u>Id.</u> at 412, n. 5. The court reasoned that the plaintiff "cannot maintain a claim of failure to proceed slowly along the tracks in order to

avoid the likelihood of hazards such as the Decedent," because "a claim of failure to maintain a slow speed to avoid potential hazards is simply another way of claiming that the train was traveling at an excessive speed given the track type, location, and conditions," which claims are preempted by Easterwood. Id.

The plaintiffs contend that the boys' age and location near the tracks off the road created a specific individual hazard that imposed upon CSX a duty to maintain a proper lookout and a duty to stop or reduce the train's speed. Engineer Blanton testified that he kept an eye on the boys because he recognized the danger that little kids might dart out. Moreover, the evidence doesn't show that the children turned around to see the train or in any way acknowledged that it was traveling toward them.

There is no evidence though that the boys were running toward the tracks when Mr. Blanton first saw them, that they were traveling with an unwavering approach or that children regularly crossed the tracks at the location of the accident. Across the street was a fence running parallel to the tracks, which the children would have to walk along before turning toward their home. The reasoning in Bashir is persuasive; similar to that case, a claim that CSX failed to stop the train before striking the boys wouldn't be preempted, but the plaintiffs' claim that the train should have slowed or stopped to avoid a potential hazard arising from the children merely walking near the tracks is preempted.

The presence of adults near the tracks wouldn't constitute a specific individual hazard; the railroad can't be required to substantially reduce its train's

speed each time people are seen walking parallel to tracks. This is a closer case because Justin, Kristopher and Jonathon were young children who had walked off Hudson Street before running toward the tracks. As CSX indicates, though, the mere presence of the children parallel to the tracks doesn't rise to the level of a unique occurrence that could cause an accident to be imminent. There was no evidence to alert the train crew that the children intended to put themselves in the path of the train. Unlike the illegally parked tank cars in <u>Lemon</u> that caused a specific hazard, the possibility that children might walk near train tracks is a generally dangerous condition that uniform national standards can address. <u>See e.g.</u>, <u>Baker v. Canadian Nat.l/Illinois Cent. Ry. Co.</u>, 397 F. Supp. 2d 803, 813 (S.D. Miss. 2005) ("A condition that can be or is present at many, or most sites cannot be a specific, individual hazard."). As in <u>Herriman</u> and the other cited cases finding preemption, imposing the duty sought by the plaintiffs in this case would require trains to reduce their speeds frequently, an outcome incompatible with the federal regulations.

A specific individual hazard arose when there was evidence to alert the train crew that the boys intended to cross the tracks. The FRSA preempts the plaintiffs' general claim for excessive speed and related tort law claims to stop or reduce the train's speed before this specific individual hazard arose. The FRSA doesn't preempt claims relating to the separate and distinct duty to keep a proper lookout, and once faced with a specific individual hazard, a duty to slow or stop the train.

*Indiana Negligence Law*

The plaintiffs' claim of negligence under Indiana law requires them to establish: (1) a duty owed by CSX to the plaintiffs; (2) a breach of that duty; and (3) injury to the plaintiffs proximately caused by the breach. Pisciotta v. Old Nat. Bankcorp, 499 F.3d 629, 635 (7th Cir. 2007); Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265, 268 (Ind. 2003).


*Duty Owed by CSX to the Plaintiffs*

Whether CSX owed a duty to the plaintiffs generally is a question of law for the courts. See Perry v. Norfolk and Western Ry. Co., No. 1:94-CV-113, 865 F. Supp. 1292, 1297 (N.D. Ind. 1994) (applying Indiana law). This is a premise liability case because Justin was injured on CSX's property. See Perry v. Norfolk, 865 F.Supp. at 1297; Maynard v. Indiana Harbor Belt R.R. Co., No. 2:96-CV-536, 997 F. Supp. 1128, 1131 (N.D. Ind. 1998). In a premise liability case, an entrant's status onto the land of another as either a trespasser, licensee or invitee determines the duty that the landowner owes to him. Burrell v. Meads, 569 N.E.2d 637, 639 (Ind. 1991); see also Perry v. Norfolk, 865 F. Supp. at1297. Licensees and trespassers enter premises for their own convenience, curiosity, or entertainment. Burrell v. Meads, 569 N.E.2d at 640. The difference between a licensee and trespasser is that licensees are privileged to enter or remain on the land by virtue of the owner's or occupier's permission or sufferance. Id.; see also Kopczynski v. Barger, 887 N.E.2d 928, 931 (Ind. 2008).

Justin was a trespasser on the tracks. He ran onto CSX's tracks at a place where there was no public crossing, and CSX doesn't allow people on its right of way at that location without express authorization. See Perry v. Norfolk, 865 F. Supp. at 1297; see also Olaniyan v. CSX Transp., 419 F.Supp.2d 1009, 1013 (N.D. Ill. 2006) (applying Indiana law). The owner of premises generally owes no duty to a trespasser except to refrain from willfully or intentionally injuring him after discovering his presence. Maynard v. Indiana Harbor, 997 F. Supp. at 1131. "A railroad company does not have a duty to anticipate a trespasser and may assume that there are no trespassers on its property." Id. at 1131-1132.

An exception to this general rule applies to trains if the trespasser is a child *non sui juris*:

> [W]here the person on the track is a child non sui juris of whose presence the railroad company had knowledge, actual or constructive . . . the company must operate its cars on such tracks with reference to the probable presence of such child and use some care to avoid injuring it; otherwise no additional care is imposed on the company over that which it owes the adult trespasser on its tracks.

Cleveland C., C. & St. L. Ry. Co. v. Means, 104 N.E. 785, 792 (Ind. Ct. App. 1914) (referred to as the Means exception), *overruled on other grounds*. The Means court established a duty of reasonable care when the train operators have actual or constructive knowledge of the presence of a child *non sui juris*. See also Olaniyan v. CSX Transp., 419 F. Supp. 2d at 1013. "*Non sui juris*" means "[n]ot his own master," and "[l]acking legal capacity to act for oneself as in the case of a minor or mentally incompetent person." BLACK'S LAW DICTIONARY, 1058 (6th ed. 1990). A

child *non sui juris* is held to be capable of exercising some care and discretion, but not necessarily the same degree of care required of a person of mature years. Maynard v. Indiana Harbor, 997 F. Supp. at 1132 (citing Cole v. Searfoss, 97 N.E. 345, 348 (Ind. Ct. App. 1912)).

In Indiana, children over the age of fourteen are chargeable with exercising the standard of care of an adult, absent special circumstances, see Perry v. Norfolk, 865 F. Supp. at1297 (citing Bailey v. Martz, 488 N.E.2d 716, 721 (Ind. Ct. App. 1986)), and children under the age of seven are presumed to be incapable of exercising the standard of care of an adult. Maynard v. Indiana Harbor, 997 F. Supp. at 1133 (citing Smith v. Diamond, 421 N.E.2d 1172, 1174 (Ind. Ct. App. 1981)). In Maynard, this court indicated that Indiana courts were unclear whether a presumption exists as to the capacity of a child between the ages of seven and fourteen to exercise care and discretion. After addressing this issue at great length, analyzing numerous Indiana cases and cases from other jurisdictions, the court determined that "the Indiana Supreme Court would not find that children between the ages of 7 and 14 are rebuttably presumed to be capable of exercising some discretion and care." Maynard v. Indiana Harbor, 997 F. Supp. at 1133. In reaching this conclusion, the court reviewed Bailey v. Martz, 488 N.E.2d 716, 721 (Ind. Ct. App. 1986) — a decision that indicated that "a rebuttable presumption exists that [children between the ages of 7 and 14] may be guilty [of negligence]" — but determined that based on other Indiana Court of Appeals decisions, the Indiana Supreme Court would correct Bailey and find that there was no such

presumption. Id. at 1134. After this analysis, the Maynard court found a question of fact as to whether the thirteen-year-old plaintiff, who was injured on railroad tracks trying to climb between two railroad cars, was *non sui juris*.

Since Maynard, though, the Indiana Supreme Court endorsed the Indiana Court of Appeals' decision in Bailey. See Creasy v. Rusk, 730 N.E.2d 659, 662 n. 3 (Ind. 2000). In Creasy, a nursing assistant sued an Alzheimer's patient for injuries she suffered when he kicked her while she was trying to put him to bed. Creasy v. Rusk, 730 N.E.2d at 661. While analyzing the duty owed by the Alzheimer's patient, the court discussed in dicta the standard of care required of children. Id. at 662. The court noted that "[t]he Restatement standard of conduct for a child is 'that of a reasonable person of like age, intelligence, and experience under like circumstances.'" Id. (citing Restatement (Second) of Torts § 283A (1965) (hereinafter, "Restatement rule")). The court said Indiana has reformulated the Restatement rule into a three-tiered analysis:

> [C]hildren under the age of 7 years are conclusively presumed to be incapable of being contributorily negligent, from 7 to 14 a rebuttable presumption exists they may be guilty thereof, and over 14, absent special circumstances, they are chargeable with exercising the standard of care of an adult.

Id. (citing Bailey v. Martz, 488 N.E.2d at 721). When a child is between the age of seven and fourteen, the Restatement standard applies and the question becomes "whether the child exercised the care under the circumstances of a child of like age, knowledge, judgment, and experience." Id.

Creasy is instructive in determining whether Justin was a child *non sui*

*juris*. This court must determine issues of Indiana law as it believes the highest court of the state would determine them. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). In accordance with the language in Creasy, Justin isn't held to the standard of care of an adult, but rather, the standard of care of a child of like age, knowledge, judgment, and experience. Nothing in this record would compel a finding that Justin's conduct fell below the standard of care of a child who became legally capable of contemplating danger only weeks before and who had never before crossed a railroad track without an adult.

The second prong of the Means exception requires that the railroad have actual or constructive knowledge of the child's presence on or near the tracks. Support exists for CSX's position that the duty of reasonable care only arises when the child is on the tracks or in a place of danger, see Davis v. Keller, 150 N.E. 70, 73 (Ind. Ct. App. 1926) (where the *non sui juris* child was injured after attempting to climb on a moving train, the court found that the train company wasn't required to anticipate that the child would go from a place of safety to a place of danger as the train passed); see also Holstine v. Director General of R.R., 134 N.E. 303, 309 (Ind. Ct. App.1922); Chicago v. Sagala, 221 N.E.2d 371, 375 (Ind. Ct. App. 1966), but other cases have recognized a duty of reasonable care to children *non sui juris* when the engineer has knowledge that children are near or in the vicinity of the tracks. See e.g., Clayton v. Penn Cent. Transp. Co., 376 N.E.2d 524, 526 (Ind. Ct. App. 1978); see also Maynard v. Indiana Harbor, 997 F. Supp. at 1131, 1137.

In Clayton v. Penn Cent. Transp., 376 N.E.2d at 525, the four-year-old plaintiff and his seven-year-old brother were playing in a city park when a freight train passed. The boys and other children ran down an embankment to the tracks where the plaintiff tried to jump on the train, couldn't hold on, and jumped off, sustaining an injury. Id. The court noted that the engineer's knowledge that "children often frequent the vicinity over which a train travels[,] place[d] an affirmative duty on the railroad company to exercise vigilance as to the non sui juris child." Id. at 526. As such, the court in Clayton held that there were genuine issues of fact concerning:

> the capacity of [the child] to understand the danger presented by the slow-moving train; the extent to which the railroad knew of the children's activities near and on the trains; the vigilance which the railroad and the conductor exercised to discover and warn children who might be endangered by the train's passage; and the extent to which the railroad's and the conductor's actions met the duty of reasonable care owed to the non sui juris child . . .

Id. at 527 (citing Wozniczka v. McKean, 247 N.E.2d 215 (Ind. Ct. App. 1969)). It would make little sense if the duty expounded in Clayton didn't similarly apply when the railroad company has actual knowledge that a *non sui juris* child is near the train tracks, as in Justin Woods's case.

When a train's engineer is aware of children *non sui juris* in the vicinity of train tracks, the railroad owes a duty of reasonable care to the children. This duty is relative, not absolute. See Indiana Harbor Belt R.R. Co. v. Jones, 41 N.E.2d 361, 364 (Ind. 1942). "[I]n the determination of the question of negligence, regard must be had to the character and location of the premises, the purpose for which

they are used, the probability of injury therefrom, the precautions necessary to prevent such injury, and the relations such precautions bear to the beneficial use of the premises." Id. ("[T]he standard of care is that which would be exercised by an ordinary prudent person under the same or similar circumstances.").

Given the children's location near the tracks and crossing, CSX's knowledge of their presence, and the probability of injury to the children trying to cross the tracks, a jury could find that the duty of reasonable care required the railroad company to keep a proper lookout and warn the children of the train's presence by sounding the horn. See e.g., Clayton v. Penn Cent. Transp. Co., 376 N.E.2d at 527 (finding that where the railroad had constructive knowledge of children *non sui juris* in the vicinity of the railroad tracks, at the very least, this knowledge imposed a duty on the train to maintain a proper lookout and may have imposed a duty to warn the children of the danger); Olaniyan v. CSX Transp., Inc., 483 F. Supp. 2d 688, 691 (N.D. Ill. 2007) (finding that the defendants owed a duty to keep a proper lookout where the *non sui juris* child had wandered on the tracks close to the public crossing).

Engineer Blanton first observed the boys near the tracks as the engine cleared the overpass at or near Columbia Avenue. As already noted, Mr. Blanton testified that he was keeping an eye on the boys because he was afraid that little kids might dart out. CSX had a duty of reasonable care to Justin; there remains a question of fact whether that duty required CSX to maintain a proper lookout and sound the horn to warn the boys of the approaching train.

*Breach of Duty of Reasonable Care and Proximate Cause*

Although "summary judgment is generally inappropriate in negligence cases because issues of contributory negligence, causation, and reasonable care are more appropriately left for the trier of fact . . . whether the evidence produced by a plaintiff is sufficient to establish a cause of action for negligence is a question of law to be decided by the court." Coffman v. PSI Energy, Inc., 815 N.E.2d 522, 527 (Ind. Ct. App. 2004) (internal citations omitted). The plaintiffs cannot succeed if the summary judgment record contains too little evidence for a reasonable trier of fact to conclude that CSX breached its duty of reasonable care to the plaintiffs or that the breach caused the plaintiffs' damages.

*Sounding the Train's Whistle*

Engineer Blanton testified that he started engaging the train's whistle before Columbia Avenue because the train was at road crossings and then continued to engage the whistle after seeing the boys walking along Hudson Street. The train's event record shows that the horn was sounded at least seven times for varying durations in the forty-three seconds before Mr. Blanton engaged the emergency brake.

Kristopher testified that he didn't hear the horn before the accident, and Justin testified that he didn't remember hearing the horn. The testimony of a witness who was near a crossing and in a situation to have heard the whistle of

a train, that he didn't hear it, generally is sufficient to support the inference that no such warning signal was given. Smith v. Russell, 253 N.E.2d 268, 271 (Ind. Ct. App. 1969) (citing Pennsylvania Co. v. Clark, Admx., 133 N.E. 588 (Ind. 1922)); see also Smith v. Chesapeake and Ohio R.R. Co., 311 N.E.2d 462 (Ind. Ct. App. 1974) (finding a genuine issue of material fact where a witness near the scene of the accident testified that he didn't hear the train's horn, even though several other witnesses and the train crew testified that the horn was sounded).

The court of appeals has held that to be probative and admissible, a witness's negative testimony that he didn't hear a whistle or bell must meet two requirements: (1) the witness must be in a position to have heard the whistle or bell, and (2) the witness must have been attentive to the whistle or bell. See Mahoney v. Norfolk & Southern Ry. Co., 2001 WL 1386086, *4 (S.D. Ind.), and cases cited therein. In Bebout v. Norfolk & Western Ry. Co., 982 F.2d 1178, 1179-1180 (7th Cir. 1993), the court of appeals addressed a similar test under Illinois law. In that case, the defendant argued that the witness was inattentive because he hadn't noticed flashing lights as he approached the crossing. Id. at 1180. The court held that although this may suggest that his "'attitude of attention' was such that the whistle was not likely to get his attention[, this] conclusion . . . invade[d] the province of the jury." Id. The witness's testimony that "he downshifted prior to crossing railroad tracks and looked both way[s] could create a reasonable inference that he had a sufficient 'attitude of attention.'" Id.

Justin's testimony that he didn't remember hearing the train's horn creates

no genuine of issue of material fact as to whether the horn was sounded. See Randall v. Norfolk Southern Ry. Co., 800 N.E.2d 951, 959-960 (Ind. Ct. App. 2003) (finding that testimony that a witness couldn't remember hearing the train's horn is insufficient to create a genuine issue of material fact). Kristopher, on the other hand, affirmatively testified that he didn't hear the horn. Unlike in Bebout though, no evidence in the record suggests that Kristopher was being attentive. There is no evidence that Kristopher looked before crossing the tracks or that he even heard the train approaching. He testified that he saw the train but mistakenly thought it was stopped. Based on these facts and the reasonable inferences drawn from them, no reasonable trier of fact could find that Kristopher was being attentive to the train's horn.

Even if Kristopher was attentive, his testimony that he didn't hear the horn wouldn't create a genuine issue of material fact as to whether the horn was sounded. Unlike in the cases just cited, CSX's train was equipped with an event recorder. The event recorder corroborated Mr. Blanton's testimony that the horn was sounded before Engineer Blanton engaged the emergency brake. Dennis Biegal, a CSX employee and a Senior Road Foreman of Engines, declared that he could interpret the locomotive event recorder data printouts and did so in this case. The plaintiffs don't dispute the event recorder's accuracy. A witness also stated that he heard the horn shortly before the accident.

In Miller v. Illinois Cent. R.R. Co., 474 F.3d 951 (7th Cir. 2007), one witness testified that she didn't hear the train sound its whistle (and that she would have

if it had). Id. at 953. The train's engineer testified he had sounded the whistle and several others were positive they had heard it. Id. An independent expert report stated without contradiction that an examination of the locomotive's "black box" after the accident revealed that the whistle had indeed been blown. Id. The court held that there was no genuine issue of material fact reasoning that the "witness who said the whistle hadn't been blown was testifying almost four years after the accident, and in the face of all the other evidence," a reasonable jury couldn't conclude that the whistle hadn't been blown "merely because one witness did not recall hearing the whistle years after a very dramatic event." Id. at 954.

Kristopher's testimony wasn't years after the accident, but this was a very dramatic event and there is no evidence that he was listening for the train. And although CSX has no independent expert report construing the event recorder, it was interpreted by a CSX employee who was capable of interpreting the data. More importantly, the record contains no evidence that the event recorder was inaccurate or misinterpreted by Mr. Biegal. No reasonable jury could find on this record that Engineer Blanton didn't engage the horn.

*Trains Regularly Stopped on the Tracks*

The plaintiffs also maintain that CSX is liable because it had a habit of stopping trains in the area where the accident occurred, and Kristopher thought that the train that hit Justin was stopped. The plaintiffs don't explain how this evidence establishes a breach of a duty owed to Justin. Moreover, the evidence is

insufficient to establish that CSX trains were regularly stopped on the tracks at this location. Mr. Woods testified that he saw a train on the tracks at the location seven or eight times over a period of five years. Kristopher and Mrs. Woods also testified that they had seen trains stopped on the tracks before the accident, but couldn't positively identify them as CSX trains. Other railroad companies have trackage rights over the tracks where the accident occurred, so the stopped trains weren't necessarily CSX trains. There is also testimony that Kristopher saw trains running on the tracks before the accident. The evidence that there were trains stopped on the tracks before the accident is insufficient to allow a finding that CSX was negligent because Kristopher believed that the train that hit Justin was stopped.

*CSX's Maintenance of Track and Easement*

The plaintiffs' complaints alleged that CSX failed to maintain the track and easement, but they haven't pointed to evidence that the track or easement were not properly maintained. Summary judgment is appropriate on this claim. See Green v. Whiteco Indust., Inc., 17 F.3d 199, 201 (7th Cir. 1994) ( "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law," but "[t]his burden 'may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."'' (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325

(1986)).

*Keeping a Proper Lookout*

Taking all facts and reasonable inferences in favor of the plaintiffs, there is a question of fact as to whether the train kept a proper lookout for the boys. Engineer Blanton testified that he "kept an eye" on the boys after first seeing them and applied the emergency brakes as soon as they ran for the tracks. Although the plaintiffs don't claim that Mr. Blanton should have seen the boys earlier, they contend that Mr. Blanton wasn't paying attention because he testified that the boys were on the road and then he saw them break away for the tracks, with no explanation of what happened in the interval when they were no longer on Hudson Street. CSX submitted two affidavits of witnesses who claim they saw the children playing and running in the Taco Bell parking lot before the accident. Although Kristopher's testimony contradicts that evidence, it creates a reasonable inference that Mr. Blanton wasn't paying attention to the children between the time they walked off Hudson Street and started running toward the tracks.

This doesn't end the inquiry. Even if CSX breached its duty to maintain a proper lookout, the plaintiffs must also establish that CSX's breach was the proximate cause of Justin's injuries. The plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the defendant's conduct was a substantial factor in bringing about the injury complained of." Collins v. American Optometric Ass'n, 693 F.2d 636, 640 (7th

Cir. 1982) (applying Indiana law). Causation normally is a matter for the jury, but when "the evidence permits only one reasonable conclusion on the question of proximate cause, the trial court is justified in removing the issue from the jury, and rendering judgment as a matter of law." Id. It is insufficient for the plaintiffs to establish a mere possibility of causation, "and when the matter remains one of pure speculation or conjecture, or the possibilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant." Id.

CSX had a duty to slow or stop the train to avoid a specific individual hazard. The record doesn't support a reasonable inference that a specific individual hazard existed before the boys began running toward the tracks. Two witnesses declared that before the boys ran for the tracks they were running and playing in the Taco Bell parking lot; one of those witnesses declared that the boys were far from the tracks. Conversely, the evidence in favor of the plaintiffs suggests that the boys were walking near the tracks before they ran out in front of the train. Whatever Engineer Blanton missed would not amount to a specific individual hazard. It is undisputed that Mr. Blanton applied the emergency brake when the boys started to run toward the tracks. CSX therefore met its duty to slow or stop the train in the face of a specific individual hazard.

It is entirely too speculative to suggest that had Mr. Blanton been more attentive, he would have discovered that the children posed a specific individual hazard before they began running toward the tracks. Because there is insufficient evidence to establish probable cause, CSX is entitled to summary judgment on the

plaintiffs' claim of failure to maintain a proper lookout.

*Attractive Nuisance*

The attractive nuisance doctrine is inapplicable to this case as a matter of law. The great weight of authority, including Indiana case law, holds that "the doctrine of attractive nuisance is not applicable to ordinary moving railroad traffic . . . the doctrine of attractive nuisance, in almost all the cases, has been held inapplicable to an action for injury to or death of a child on a moving train." See Perry v. Norfolk, 865 F. Supp. at 1302, and cases cited therein; see also Clayton v. Penn. Cent. Transp., 376 N.E.2d at 526; Davis v. Keller, 150 N.E. at 72. The court in Perry explained:

> 'The overwhelming weight of authority [supports the notion that the attractive nuisance doctrine] does not apply as a matter of law in cases where child trespassers are injured by moving trains because a moving train is not a subtle or hidden danger and its potential for causing serious bodily injury or death to anyone in its path is readily apparent, even to young children.'

Perry v. Norfolk, 865 F. Supp. at 1302-1303 (quoting McKinney v. Hartz & Restle Realtors, Inc., 510 N.E.2d 386, 389 (Ohio 1987)). CSX is entitled to judgment as a matter of law on the plaintiffs' claim of attractive nuisance.

*Loss of Services*

Kristopher and Mr. and Mrs. Woods also have claims for loss of services. "Loss of consortium, loss of services, loss of love and affection, and other such

claims, are purely relational." <u>Indiana Patient's Compensation Fund v. Winkle,</u> 863 N.E.2d 1, 6 (Ind. Ct. App. 2007), *transfer denied*. Such claims are derivative and are basically an additional element of the damage caused by the incident. <u>Id.</u> Because Justin isn't entitled to relief on his claim for injuries, Kristopher's and Mr. and Ms. Woods' claim necessarily fails. CSX is entitled to judgment on the loss of services claim in this action.

*Negligent Infliction of Emotional Distress*

CSX moved for summary judgment on Kristopher's and Mr. and Mrs. Woods' claims for negligent infliction of emotional distress. CSX contends that these claims "are dependent on the success of Justin's underlying negligence claim," so if the court grants summary judgment on Justin's claims, it should also grant summary judgment on all of Kristopher's and Mr. and Mrs. Woods' other claims.

Negligent infliction of emotional distress isn't an element of the damage, but the damage itself. <u>Indiana Patient's Compensation Fund v. Winkle,</u> 863 N.E.2d at 6-7. It is a direct, personal, on-the-scene injury. <u>Id.</u> Because claims of negligent infliction of emotional distress no longer require an underlying physical injury or even a physical impact, the Indiana courts have held that it is an independent tort. <u>See</u> <u>Clancy v. Goad</u>, 858 N.E.2d 653, 661-663 (Ind. Ct. App. 2006), *trans. denied*. The Indiana Supreme Court explained:

[W]here the direct impact test is not met, a bystander may

nevertheless establish 'direct involvement' by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling *caused by the defendant's negligent or otherwise tortious conduct.*

Atlantic Coast Airlines v. Cook, 857 N.E.2d 989, 997-98 (Ind. 2006) (emphasis added).

Although negligent infliction of emotional distress is an independent tort, to recover damages under this theory, Kristopher and Mr. and Mrs. Woods must establish that the accident was caused by CSX's negligent or otherwise tortious conduct. Because no reasonable trier of fact could find that CSX was negligent, the plaintiffs' claims for negligent infliction of emotional distress cannot survive summary judgment.

IV. CONCLUSION

Today's ruling — finding a railroad not liable, as a matter of law, for striking a seven-year-old child on its tracks — is not a comfortable one. In light of the preemption of the plaintiffs' general claim for excessive speed and related tort law claims to stop or reduce the train's speed, no reasonable trier of fact could find on this record that the railroad's breach of any duty proximately caused the collision. CSX's summary judgment motion [Doc. No. 25] therefore must be, and hereby is, GRANTED.

SO ORDERED.

ENTERED:  November 24, 2008

   /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court